ORIGINAL

James H. Fosbinder #7070
IVEY FOSBINDER FOSBINDER LLLC
A LIMITED LIABILITY LAW COMPANY
1883 Mill Street
Wailuku, Hawaii  96793
Telephone:  (808)242-4956
Facsimile: (808)249-0668
Email: jfosbinder@iff-law.com

Attorneys for Plaintiffs
ROGELIO GUZMAN and MARIA G. GUTIERREZ

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

MAR 01 2011

at _1_ o'clock and _00_ min. _P_ M
SUE BEITIA, CLERK

## UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ROGELIO GUZMAN<br>and MARIA G. GUTIERREZ<br><br><br>Plaintiffs,<br><br>        vs.<br><br>CENTRAL PACIFIC HOME LOANS,<br>INC.; BAC HOME LOANS SERVICING,<br>LP; BANK OF AMERICA, N.A.;<br>MORTGAGE ELECTRONIC<br>REGISTRATION SYSTEM, INC.;<br>FEDERAL NATIONAL MORTGAGE<br>ASSOCIATION; and JOHN DOES 1-<br>50, inclusive<br><br><br>Defendants. | CIVIL NO.: CV11 00126 LEK BMK<br><br><br>COMPLAINT; DEMAND FOR JURY<br>TRIAL; SUMMONS |

## COMPLAINT

        Plaintiffs   Rogelio   Guzman   and   Maria   G.   Gutierrez

(Plaintiffs), by and through their attorney, JAMES H. FOSBINDER,

1

of IVEY, FOSBINDER, FOSBINDER LLLC, a limited liability law
company, bring the following Complaint and allege as follows:

## JURISDICTION AND VENUE

1.    Jurisdiction arises under 28 U.S.C. § 1331 (Federal
Question Jurisdiction); the Sherman Anti-Trust Act, 15 U.S.C. §
1 et seq.; Clayton Anti-Trust Act, 15 U.S.C. § 12, et seq.; Home
Ownership Equity Protection Act (HOEPA), 15 U.S.C. 1639 et seq.;
Title 24 CFR, Regulation X, Part 3500; the Equal Credit
Opportunity Act (Reg. B, 12 C.F.R. 202); Fair Credit Reporting
Act, 15 U.S.C. 1681, et seq.; Fair Debt Collection Procedures
Act (FDCPA), 15 U.S.C. Sec. 1692-1692p; and 18 U.S.C. §§ 1341,
1343.

2.    This Court has supplemental jurisdiction over this
action under 28 U.S.C. § 1367(a) because state law claims are so
related to the federal claims that they form part of the same
case or controversy. These claims all arise out of the same
controversy and sequence of events. This Court has jurisdiction
over state claims asserted under Hawaii Revised Statutes
(hereinafter "HRS") by virtue of pendent jurisdiction.

3.    Venue is proper in the United States District Court
for the District of Hawaii, pursuant to 28 U.S.C. § 1391, in
that Defendants systematically conduct and transact substantial
business in this State and District as licensed banks and

corporations organized and/or operating in the State of Hawaii, the causes of action occurred in this District, and Plaintiff resides in this District.

## PARTIES

4.    Plaintiffs, Rogelio Guzman and Maria G. Gutierrez are and were at all times relevant over the age of eighteen, residents of the County of Maui, State of Hawaii, and are consumers in regards to credit transactions.

5.    Defendant Central Pacific HomeLoans, Inc. is a Hawaii Corporation existing under the laws of the State of Hawaii (CPH) and was the originating lender under a Mortgage dated February 26, 2008, in the amount of $229,500.00, that was recorded March 4, 2008, in the State of Hawaii Bureau of Conveyances, Document No. 2008-032561 (Mortgage). CPH is believed to be the holder of the Promissory Note dated the same day.

6.    Defendant Mortgage Electronic Registration Systems, Inc. (hereinafter "MERS"), a New York corporation, provides mortgage related services in all fifty states, and is "nominee" for Defendant CPH pursuant to the Mortgage, referenced above.

7.    Defendant BAC HOME LOAN SERVICING, LP ("BAC"), is a Texas Limited Partnership, which conducts business within the State of Hawaii. Upon information and belief, BAC is a division of BANK OF AMERICA, N.A.

8.   Defendant BANK OF AMERICA, N.A., ("BOA") was at all times relevant hereto a National Banking Association organized under the laws of the State of Delaware, and conducting business within the State of Hawaii.

9.   Defendant MERS allegedly transferred the interest in the Subject Mortgage it held as "nominee" for Defendant CPH to Defendant BAC through an Assignment of Mortgage, dated March 25, 2010, and recorded in the State of Hawaii Bureau of Conveyances, Document No. 2010-047976.

10.   Defendant BAC alleges it was the foreclosing mortgagee of the Subject Mortgage. According to Defendant BAC's "Mortgagee's Affidavit of Foreclosure Under Power of Sale," Defendant BAC alleges it was the highest bidder ($187,718.15) at the foreclosure sale on June 15, 2010 of the subject property. Said Affidavit was recorded in the State of Hawaii Bureau of Conveyances as Document No. 2010-091757.

11.   Defendant FEDERAL NATIONAL MORTGAGE ASSOCIATION ("FNMA") is a congressionally chartered corporation and claims it is the current owner of the Subject Property pursuant to a letter sent by its counsel to the Plaintiffs on January 21, 2011, RCO Hawaii LLC. Upon information and belief, as of February 16, 2011, no document conveying title to FNMA has been recorded in the State of Hawaii Bureau of Conveyances.

12.   The acts and, or omissions of Defendants alleged in this Complaint were performed by their agents, officers, affiliates and, or employees within the scope of their actual or apparent authority which were known and, or should have been known to Defendants and, or their predecessors or successors in interest and are imputed to Defendants.

13.   DOES Defendants 1-50, inclusive, are various individuals, partnerships, associations, corporations, and other entities claiming any legal right, title, estate, lien, or interest in the Subject Property, as described adverse to Plaintiffs' interests. Plaintiffs will make a good faith effort to determine the true names and identities of these parties. Plaintiffs reserve the right to amend this Complaint to add such parties as their true identities and capacities are ascertained through discovery or otherwise.

14.   Additionally, Defendants as a group, or common enterprise, operate mortgage originating and mortgage servicing businesses that solicit, cater, and service millions of home loans annually. Based on understanding and belief, Defendants and their agents, officers, affiliates and employees have operated as a common enterprise while engaging in the unlawful acts and practices alleged below. Because Defendants have operated as a common enterprise, each of them should be held

jointly and severally liable for the acts and practices alleged below.

## INTRODUCTION[1]

15. Historically, mortgage loans have made by lenders within the local marketplace. Banks made money by charging more interest than they paid to depositors. If the bank made bad loans, the bank lost income. For this reason, banks made serious investigation of the borrower's ability to pay back the loan. When a bank approved a loan application, it meant something; it was likely the borrower *could* and *would* repay the loan. Loans often remained with the original lender for the lifetime of the loan.

16. Although speculation in real estate existed, profits were generally made from appreciation of property values over time largely because of the checks and balances of the loan origination process itself and also due to the demands of the statutory recordation requirements. The only way to aggressively buy and sell an interest in mortgage-related assets on a

---

[1] This is an extraordinary case. At times, as explained in this Complaint, terms to do not have their traditional meanings as they have been converted by MERS. For this reason, it is believed that an unconventional pleading style can and will best convey the Plaintiffs' message, and tolerance for such unconventionality is respectfully requested as being in the best interests of justice and truth. In light of the liberties taken by the Defendants in terms of judicial and statutory administration and procedure, the tolerance of this Court for

frequent basis was to buy stock in corporations that invested in real estate. Most important, it was almost impossible to invest, in a speculative way, in single-family homes. You could invest in the stocks of companies that built single-family homes, or in the stock of lenders that financed home loans, but that was about it. Day trading in securities based on real property did not exist, and the securitization of residential mortgages was non-existent.

17. Transactions in real property such as deeds, mortgages, and assignments of mortgage were recorded in the Hawaii Bureau of Conveyances and/or with the Assistant Registrar of the Land Court. If a mortgage was assigned to a new mortgagee, that assignment was recorded and therefore was publicly available for review.

18. These recordings were not fast or cheap for the mortgage industry. Seeking a means of capitalizing on the huge profits to be made from mortgage securitization, the largest banks in the United States got together to form Merscorp, Inc., in or about 1996. Mortgage Electronic Registration System, Inc., whose sole shareholder is Merscorp (Collectively, the entities are referred to herein as "MERS"), was then allegedly created to streamline the mortgage banking industry by using

---

the slightly unconventional stylings of the undersigned counsel in this pleading would seem warranted.

"electronic commerce" to eliminate paper – which allowed the mortgage industry to circumvent the state's recordation statutes and bundle mortgages into packages they could then sell to investors.

19. MERS' mission was to register every mortgage loan in the United States[2] to facilitate trading in mortgage-backed securities. The MERS monopoly now includes more than 90 percent of the mortgage lenders and servicers active in the United States real estate market. Since its creation, MERS has undermined and eviscerated the long-standing principles of real property law and the state's recording statutes. Hence, the borrowers and the public at large are paying an enormous price for the profits reaped by this scheme, not to mention robbing the states of their transfer and excise tax revenues.

20. The way MERS circumvents the state's recording statutes is as follows: In mortgages, MERS is named as "nominee" for the lender (arguably a form of agency). It is often the entity recorded in the state recordation office as being the original mortgagee. MERS claims that this "inoculates" the mortgage against future assignments because MERS remains the nominal mortgagee "no matter how many times servicing is

---

[2] "About MERS," Merscorp, Inc. www.mersinc.org/about/index.aspx. Retrieved 11/8/2010.

traded."[3] Tracking subsequent assignments of mortgage happens strictly within the MERS databases.

> "Because MERS remains the mortgagee of record in the public land records throughout the life of the loan; it eliminates the need to record later assignments in the public land records… . MERS does not create electronic assignments; it eliminates the need for subsequent assignments altogether. After MERS becomes Mortgagee, there are no more assignments, except on the rare occasion when a Member wants an assignment from MERS."[4]

21. A typical clause naming MERS in a mortgage is as follows: *"MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as nominee for Lender and Lender's successors and assigns. MERS is the mortgagee under this Security Instrument.*

22. Recent legal challenges have questioned the legal inconsistencies in MERS' roles: as "nominee" (arguably "agent") and also as "mortgagee," i.e., the owner of the real property right to foreclose. An entity can not be both an agent and a principal with respect to the same right. Further, upon information and belief, the State of Hawaii has never authorized MERS to make changes to the state's real property recording statutes. Plaintiffs argues that MERS, purporting to act "solely

---

[3] Id., "About MERS," Merscorp, Inc.
www.mersinc.org/about/index.aspx. Retrieved 11/8/2010.
[4] *R.K. Arnold, "Yes, There is Life on MERS®" Real Estate Law, ABA Network, Spring 1998, Vol. 2, No. 1.*
http://www.abanet.org/genpractice/magazine/1998/spring-bos/arnold.html.

as nominee," furthers foreclosures by (among other acts) transferring promissory notes and appointing assignees under assignments of mortgage in a system that is hidden from public and governmental scrutiny and oversight. For example, it is nearly impossible for any but the most savvy researcher to discover the trail of assignments leading to a borrower's current note holder and mortgagee. In many cases, the actual mortgage and promissory note have been destroyed or are now missing, which raises questions of who owns the mortgage and note and how, or who, enforces these agreements. Missing documents leaves the parties to the contract unidentifiable, which also affects contract reformation and those wishing to effectuate a loan modification.

23. With the largest lending institutions' joint creation of MERS the mortgage industry introduced new products such as no-documentation loans, adjustable-rate mortgages "ARMS," and, negative amortization adjustable rate mortgages, where a borrower could owe more on the principal each and every month. Further, mortgage lenders acting in concert relaxed lending standards, making low-income individuals eligible for loans. This in turn, drove up property values. Part of this scheme included accepting appraisals that purported to document the new, higher values. The result was that hundreds of thousands of applications for financing were approved nationwide, most of

which would have been declined under traditional lending standards.

24. Behind the veil of Merscorp and MERS, the big lending institutions knew they were issuing bad loans, but they intended to get in and get out of the loans before the borrowers defaulted. The result is that the borrowers and the investors in mortgage-backed securities were both victims of a mass fraud perpetuated by MERS and its members. Both the borrower and investor were sold a bill of goods that was over-inflated in value and quality.

25. MERS was created primarily to facilitate the securitization of mortgages, which, in simple terms, involves three steps: First, a mortgage is sold by its originating lender; second, the mortgages are "bundled" or "pooled"; third, the pool of mortgages is securitized and divided into "tranches" (broken up into groups indicative of the risk) and sold to investors similar to shares in a mutual fund.

26. The third step – securitization – of a pool of mortgages is complicated, and the process is (or should be) governed by the laws of the jurisdiction in which the securitization takes place. The early mortgage securitization contracts were designed to satisfy state and federal laws, such as the Uniform Commercial Code (governing "secured" transactions), and state trust law (packaged loans were often

put into trusts to allegedly offered protections that appealed to investors).

27. Securitizing a mortgage loan is labor-intensive. The promissory note had to be endorsed by the originator and other parties before it could be placed into a trust or pool of mortgages, and, the mortgage had to be assigned to the note-holder. Generally, this process must be completed within 90 days of a trust's "closing." Mortgage-backed securities are similar to bonds, most being issued by U.S. government-sponsored Federal National Mortgage Association (Defendant FNMA) and the Federal Home Loan Mortgage Corporation (Freddie Mac).

28. With the securitization of mortgages, banks and investors could wager on the future value of mortgages. When interest rates rose, these mortgage-backed securities (similar to bonds) fell in value; conversely, when interest rates fell, the value of the mortgage backed security rose.

29. With securitization, MERS, its members, and others with inside information could win big. If an investor was privy to information that a good number of mortgages in a pool would fail, or that the mortgages exceeded the value of the collateral, they could foresee and bet that these mortgage-backed securities would be worth less in the future. Additionally the leverage available through the options, or futures market, and a banking institution could gamble on

millions of dollars of mortgages with very little investment. These highly leveraged "derivatives" enabled investors to capitalize on mortgages being worth more, or worth less, in the short term without holding the underlying note, mortgage, or property.

30. Hence, a banking institution could "insure" itself against losses in the underlying mortgages by betting that a number of the mortgages it underwrote would fail.  Talk about inside information.  Making the deal even sweeter for the banks, and originators of the loans, most of the mortgages had already been sold via MERS, into an investment pool where the actual investors were sold a security that was over-inflated in value and quality.

31. Most institutions holding subprime mortgages required mortgage insurance on the loans, sometimes insuring against failure 30-times over. They stood to gain more if a borrower defaulted than if he performed fully; hence, there was not much of an incentive to modify or refinance loans for borrowers who had fallen on tough times – despite federal government programs paying lending institutions to work with borrowers for home retention.

32. For those loans that were insured against default – what happened to the insurance money? Has the foreclosing lender been paid once by the insurance company (financed by a federal

bailout of insurance giant AIG and others) and seeks to be paid twice by foreclosing on the real property and selling it? If the foreclosing lender has already been paid off, then is the proper party in interest the insurer?

33.   The MERS cartel also controls mortgage servicing and another product, called "foreclosure assistance." Their monopoly here is roughly 90 percent. One such firm has made national news by offering a menu of services, which has been reported by the national media to include "creating – that is, conjuring from thin air – various documents that the trust owning the loan should already have on hand." The firm offers creation of a "collateral file," i.e., all the documents needed to establish ownership of a real estate loan. "Equipped with a collateral file, you may be able to persuade a court that you were entitled to foreclose on a house, even if you had never owned the loan."[5]

34.   Attorney Generals from all 50 states are investigating the poor record keeping by MERS, banks, and the servicers (companies that collect mortgage payments). The Federal Reserve is investigating whether mortgage companies have cut corners in the foreclosure process, using "robo-signers" to sign thousands

---

[5] Smith, Yves, "How the Banks Put the Economy Underwater," New York Times, October 30, 2010.
http://www.nytimes.com/2010/10/31/opinion/31smith.html?_r=1&sq=m

of mortgage assignments and foreclosure documents without having made the legal investigation required to execute such documents.

35. Many anti-trust claims involve esoteric mathematical analysis of claimed price manipulation by companies controlling as little as 10 percent of an industry in relatively small area. Complex math is not necessary in this case. Under any test, MERS and its shareholders control the mortgage industry, the foreclosure assistance industry, and the digital identification of real property.

36. What MERS and the mortgage industry did was to turn poker in the back of the neighborhood bar, where there were no sharks and everyone knew each other and the pace was leisurely, into Monte Carlo, Las Vegas and internet gambling all rolled into one. As a result the real property markets were destabilized; banks made fabulous income on fees and a million families will lose their homes to foreclosure. Some have alleged MERS created a Ponzi scheme.

37. What justice demands today is that the borrowers -- and the investors -- in the mortgages have an opportunity to work through this mess of the securitization of mortgages and come to a resolution that is best for both parties, and additionally, the public at large. Plaintiffs request the

ortgage securitization&st=cse&scp=1&pagewanted=all. Accessed 11/8/2010.

opportunity to work with the actual investors of the mortgages, which would be a question of fact that can only be resolved by an evidentiary hearing into who is the actual Note Holder, how much is owed, to whom, and, whether any third-party payments have been made on Plaintiffs' behalf, by insurance, the government, or otherwise.

## STATEMENT OF FACTS

38.  Plaintiffs incorporate all of the preceding paragraphs of this complaint as if set forth in full here.

39.  Plaintiffs entered into a loan transaction with CENTRAL PACIFIC HOMELOANS, INC. ("CPH") regarding their principal residence located at 3676 Lower Honoapiilani Road, #C-103, Lahaina, Hawaii, 96761, TMK No. (2) 4-4-001-038 CPR 0027 (Subject Property). The purpose of the refinance was to pay off an existing COUNTRYWIDE HOME LOANS first mortgage ($180,473) and a HSBC MORTGAGE CORPORATION (USA) second mortgage ($46,049). The Plaintiffs had originally approached COUNTRYWIDE to refinance but were informed that COUNTRYWIDE would not consider refinancing and/or modifying its own loan because the apartments in the area were not selling for an amount that would support a new loan.

40.  Thereafter, the Plaintiffs went to CENTRAL PACIFIC BANK to refinance their existing loans. The mortgage broker assisting the Plaintiffs was KAALA BUENCONSEJO, who Plaintiffs

believe was at all relevant times, an employee of CENTRAL PACIFIC BANK and/or CENTRAL PACIFIC HOMELOANS, INC. Mr. BUENCONSEJO held himself out to be Plaintiffs' loan broker, and they believed that this meant that he would advise and guide them through the loan process.

41. Plaintiffs executed a Promissory Note in the principal amount of $229,500 on February 26, 2008 (Note), which was secured by a Mortgage dated the same date, recorded in the State of Hawaii Bureau of Conveyances as Document No. 2008-032561 on March 4, 2008, by Defendant MERS, purportedly as "nominee" for Defendant CPH. Said Mortgage was given the MIN number 1001595-0000841474-6.

42. Upon information and belief, Defendant CPH retained the ownership and/or servicing of the Mortgage, and received the Plaintiffs' monthly mortgage payments until approximately March 2009, when Plaintiff ROGELIO GUZMAN went to CENTRAL PACIFIC BANK to make a mortgage payment as he had done since the origination of the Subject Mortgage. He was informed that the mortgage was no longer in the bank's system. He was confused and sought the assistance of Mr. BUENCONSEJO, the mortgage broker. After lengthy research, Mr. BUENCONSEJO informed Plaintiff GUZMAN that the Subject Mortgage had been purchased by COUNTRYWIDE, which confused the Plaintiff, as that entity had initially refused to refinance its own mortgage in 2008.

43.   Based on information and belief, during the life of the loan, Defendant CPH, by and through its agent and/or "nominee" MERS sold and/or transferred the Note and/or Mortgage without proper endorsements or assignments, resulting in Defendant BAC not having the right and interest to foreclose upon the subject property.

44.   In approximately May 2009, the economy took a downturn, and Plaintiff GUZMAN's employer cut his hours. In addition, Plaintiff GUTIERREZ was reassigned by her employer to "on call" status, and subsequently had to file for unemployment insurance. During this time, Plaintiffs used their savings to make their monthly mortgage payments.

45.   During this period in mid-2009, Plaintiffs contacted BOA and/or BAC to request a loan modification. Plaintiffs applied for a loan modification and submitted all required documentation, including tax returns, proof of income, and private information such as social security numbers to BAC. Plaintiffs continued to make their loan payments as long as they were able, and only ceased making payments in October 2009.

46.   Plaintiff GUZMAN contacted BAC numerous times to check on the status of their loan modification application. He was told repeatedly that the paperwork had not been received. Plaintiffs mailed (and faxed) all requested information again via registered mail, and retain the receipts to prove that BAC

received the application. Again, each time he contacted BOA/BAC to check on the status of his modification application, he was told that the person he reached could not help him, and he was given another name and telephone number of someone else at BAC to contact. Eventually Plaintiff GUZMAN was given the name of a male employee of BAC to contact. Although Plaintiff GUZMAN called him repeatedly for approximately one month and left numerous messages, but his calls were never returned. Finally, he was informed that the man no longer worked for BAC, at which time he was given a female contact.

47. Defendant BAC did not negotiate the loan modification in good faith, and breached the terms of its contract with the federal government under the HAMP program, under which the Plaintiffs are intended third-party beneficiaries.

48. **At the very same time**, while one hand at BAC "negotiated" with the Plaintiffs to modify their loan, the other hand foreclosed non-judicially on the loan, sold it at auction to itself, as follows.

49. Plaintiffs were ironically offered a loan modification with a principal balance of $243,792 on August 27, 2010, more than two months after their home had been auctioned on June 15, 2010, for $187,718.15. By letter dated September 8, 2010, Karen R. Hill, identified as a "Customer Advocate" with Bank of America's Office of the CEO and President, informed the

Plaintiffs that the "foreclosure was rescinded through August 23, 2010." Plaintiffs had not been advised of this "rescission" which apparently also ended 4 days prior to the modification "offer."

50. Defendant MERS purportedly executed an Assignment of Mortgage on March 25, 2010, as nominee for CENTRAL PACIFIC HOMELOANS, INC., to BAC HOME LOANS SERVICING, LP, which was recorded April 9, 2010, as Document No. 2010-047976. Said Assignment is silent as to any transfer or endorsement of the Promissory Note. Plaintiffs were not informed of the assignment of the Subject Mortgage.

51. The Assignment of Mortgage upon which BAC bases its claim of ownership (and subsequent non-judicial foreclosure) was allegedly executed by RHOENA RICE, as Vice President of MERS, who Plaintiffs allege, upon information and belief, is a known "robo-signer." RHOENA RICE is believed to be a Vice President of BANK OF AMERICA, N.A., or BAC GP, LLC, a Nevada limited liability company, which is believed to be the general partner of BAC HOME LOANS SERVICING, LP, formerly known as COUNTRYWIDE HOME LOANS SERVICING, LP., a subsidiary of BANK OF AMERICA, N.A.

52. Plaintiffs allege that BAC and/or BOA's own employee, RHOENA RICE, signed the Assignment of Mortgage, conveying the mortgage to her employer to record in the public record. Plaintiff alleges that this activity constitutes self-dealing

and fraud. In other words, the Assignment of Mortgage, filed in the public records, purports to convey an assignment from MERS to BAC, but it is actually signed by an employee of BAC or its parent company BOA, and is therefore a fraud and/or is void or voidable.

53. Plaintiffs further allege that BAC and/or BOA's attorneys, ROUTH CRABTREE OLSEN ("RCO"), prepared the Assignment of Mortgage, provided it to its own client (BAC and/or BOA) to sign (on behalf of the original mortgagee, which was MERS), and then caused the Assignment to be recorded. Plaintiffs allege that BAC and/or BOA used RCO's services to commit crime or fraud, which activity may also violate Hawaii Rules of Professional Conduct Rule 1.16.

54. In or about June 2010, Plaintiffs were notified by either BAC or BOA by letter stating that the Subject Property would be publicly auctioned on June 15, 2010. Plaintiff GUZMAN contacted BAC and was advised that the auction had been rescheduled. Plaintiffs were not informed of the rescheduled auction date nor advised of their options.

55. Plaintiffs deny receiving notices of non-judicial foreclosure or Fair Debt Collection Letters. To wit, the Mortgagee's Affidavit of Foreclosure Under Power of Sale, which was recorded June 30, 2010, in the State of Hawaii Bureau of Conveyances as Document No. 2010-091757, purports to attach, as

Exhibit B, a Notice of Mortgagee's Intention to Foreclose Under Power of Sale, which Derek Wong, as counsel for BAC, swears under oath was sent by certified mail or personal service to the Plaintiffs. There is no Exhibit B or record of certified mail attached. Exhibit D to the Affidavit purports to be a Return of Posting of the Notice of Intent to Foreclose, however, again, the purported Notice is not attached to that exhibit. These discrepancies constitute material violations of Hawaii Revised Statutes 667-5 to 667-10 and render the non-judicial foreclosure of the Plaintiffs' Mortgage invalid.

56. In approximately July or August of 2010, an unknown person posted a paper entitled "Knowing Your Options" on the door of the Subject Property. This paper further stated that Defendant FEDERAL NATIONAL MORTGAGE ASSOCIATION ("Fannie Mae" or "FNMA") now owned the Subject Property. This paper included the telephone number of a local real estate agent and the number to Fannie Mae. Plaintiff GUZMAN contacted the realtor who informed him that he knew nothing about the notice. Plaintiff GUZMAN contacted Fannie Mae and was informed that he should contact Defendant BAC.

57.   Upon information and belief, no deed conveying title to the Subject Property to FNMA has been recorded in the State of Hawaii Bureau of Conveyances as of February 16, 2011.

58.   In a strange twist, BAC approved Plaintiffs' loan modification on **August 17, 2010** – two months after it foreclosed on the property and auctioned it off to itself on for a deep discount of $187,718.15. The terms of the "approved loan modification" were a principal balance of $243,792, which includes more than $19,000 in additions to principal (and more than $56,000 over and above the auction price). Plaintiffs believe that the current fair market value of the Subject Property (which is leasehold) is approximately **$60,000.**

59.   On January 21, 2011, Plaintiffs received a letter from the law office RCO, informing them that they had ten days to vacate the Subject Property because it was sold in a non-judicial foreclosure to FNMA.

60.   Violations of federal and state statutes, alleged herein, bar Defendants from filing, causing to be filed, and/or conducting ejectment proceedings against Plaintiffs. Alternatively, Plaintiffs' defenses, claims and rights, including but not limited to the right to recovery of damages, injunction and any other remedy available under State, Federal, and/or common law, under the Mortgage and Note bar Defendants

from taking any action, including filing, causing to be filed, and/or conducting ejectment proceedings against Plaintiff.

## CLAIM I
## VIOLATIONS OF THE SHERMAN/CLAYTON ANTI-TRUST ACTS
### (Against All Defendants)

61.  Plaintiffs incorporate all of the preceding paragraphs of this complaint as if set forth in full here.

62.  Plaintiffs are informed and believe, and on that basis allege that CPH agreed to include MERS as mortgagee and "nominee" for the Mortgage as part of an agreement between CPH as a "member" of MERS, MERS itself, BOA, FANNIE MAE, and other large financial institutions, to (a) protect and insulate CPH from otherwise valid claims and defenses by mortgagors and borrowers by providing an intermediary in the transaction; (b) provide a conduit for the securitization, and exclusive access to the business of servicing securitized mortgage loans CPH and DOE Defendants, to the detriment of Plaintiffs, in that they are subject to the imposition of artificially high mortgage rates and fees for mortgage servicing, without any meaningful choice, and without any opportunity to bargain for more advantageous fees, such fees being added to any balance due to the mortgagee in the event of default, all inconsistent with a system of free and fair trade guaranteed to all persons, and the restraint of which violates the Sherman Anti-Trust Act, 15 U.S.C. § 2. Plaintiffs, as private parties, have standing to bring federal

anti-trust claim(s) under the Clayton Anti-Trust Act, 15 U.S.C. §15.

63. The Defendants' actions controlled the residential mortgage loan credit market and recent history has shown that this activity has influenced and destabilized the world economy. To wit: "Anchored by six megabanks—Bank of America, JPMorgan Chase, Citigroup, Wells Fargo, Goldman Sachs, and Morgan Stanley—which together control assets amounting, astonishingly, to more than 60 percent of the country's gross domestic product, these financial institutions (now more emphatically "too big to fail") continue to hold the global economy hostage."[6] The market share of the monopolistic megabanks is up from approximately 20 percent in the early 1990s. Since the massive federal bailout, the concentration has increased even more during the last two years.[7]

64. Defendants inflated the real estate market in an effort to create and sell subprime mortgages. They sold over-leveraged, highly inflated loans to Plaintiffs, who were unsophisticated borrowers who did not know they were being set up to fail. Defendants then "pooled" groups of mortgages and securitized said mortgages. Defendants created or participated in a securities ratings scheme designed to fraudulently rate

---

[6] Simon Johnson and James Kwak, 13 Bankers, The Wall Street Takeover and the Next Financial Meltdown (2010).
[7] Simon Johnson, An Antitrust Investigation of Banks?, New York Times, January 21, 2010, at http://economix.blogs.nytimes.com/2010/01/21/an-antitrust-investigation-of-the-banks.

these securities as safer than they truly were. Then, based upon their fraudulent misrepresentations of the securities, Defendants sold the securities to investors who were also duped into believing that these mortgages were sound financial products.

65. Defendants or entities under their enterprise, took positions in the futures, or options, markets whereby Defendants sought to profit, and did profit, from the collapse of the real estate market, and, benefited from the foreclosure of numerous mortgages that Defendants originated, serviced, or controlled.

66. Defendants' acts worked to create the collapse of the mortgage market, which in turn created an economic collapse unprecedented since the Great Depression. Plainitffs, like millions of Americans, experienced a severe decline in their income, which resulted in Plaintiffs being unable to pay their mortgage payments and suffering a decline in their credit rating causing them to be unable to secure refinancing, which is just as Defendants planned.

67. Section 4 of the Clayton Antitrust Act, codified at 15 U.S.C. §15, provides as follows:

> [A]ny person who shall be injured in their business or property by reason of anything forbidden in the antitrust laws may sue therefor in any district court of the United States in the district in which the defendant resides or is found or has an agent, without respect to the amount in controversy, and shall recover threefold the damages by him

sustained, and the cost of suit, including a reasonable attorney's fee.

Plaintiffs allege they are such persons injured in their property, and are therefore entitled to bring an action against Defendants for Defendants' actions complained of above.

68. As a direct and proximate result of the unlawful conduct of Defendants, and each of them, in monopolizing or attempting to monopolize the mortgage lending and servicing market, Plaintiffs have suffered pecuniary damages in an amount to be determined, and subject to treble augmentation.

69. Plaintiffs have also been required to retain legal counsel and therefore request that the defendants be required to pay Plaintiffs' attorney fees and costs necessary to pursue their legal and just claims, pursuant to 15 U.S.C. §15.

## CLAIM II
## VIOLATIONS OF THE HAWAII ANTI-TRUST/ANTI-MONOPOLY ACTS

70. Plaintiffs incorporate all of the preceding paragraphs of this complaint as if set forth in full here.

71. Mortgage lending and servicing in Hawaii is an activity in or affecting interstate commerce, as the parties traffic in personal service to foreigners and rely on foreign goods for their businesses.

72. The conduct of Defendants as described more fully hereinabove violates the Hawaii Anti-Trust Act, Hawaii Revised

Statutes § 480-13, and the Hawaii Monopolization Act, Hawaii Revised Statutes § 480-9.

73. As a direct and proximate result of the unlawful conduct of Defendants, and each of them, in monopolizing and/or attempting to monopolize the mortgage lending and servicing market, have suffered pecuniary damages in an amount to be determined, along with other pecuniary and non-pecuniary damages.

**CLAIM III**
**VIOLATIONS OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT**
**(Against Defendants CPH and MERS)**

74. Plaintiffs incorporate all of the preceding paragraphs of this complaint as if set forth in full here.

75. As mortgage lenders, defendants are subject to the provisions of the REAL ESTATE SETTLEMENT PROCEDURES ACT ("RESPA"), 12 USC section 2601 et seq.

76. In violation of 12 USC section 2607 in connection with the mortgage loan to Plaintiffs, Defendants and, or their predecessors or successors in interest violated RESPA by accepting charges for the rendering of real estate services that were in fact charges for other than services actually performed.

77. As part of the scheme alleged in this Complaint, MERS members give, and MERS accepts, kickbacks pursuant to an agreement that federally related mortgage loans shall be

registered with MERS. Such kickbacks violate 12 U.S.C. § 2607(a) and are not a violation that can be waived.

78. When a MERS member originates a federally related mortgage loan and registers the note and/or mortgage with MERS, it passes on the $3.95 MERS registration fee to the borrower.[8] It passes on the fee by including it within the fees disclosed on the HUD-1 Settlement Statement. The MERS member then kicks back to MERS the registration fee received by way of the borrower's payment of the settlement costs.

79. The registration fee that is actually paid by the Plaintiffs does not benefit them, but is instead wholly related to services that benefit the lender, servicer, MERS and/or its members.

80. As part of the scheme alleged in this Complaint, MERS members give, and MERS accepts, charges made or received for the rendering of real estate settlement services in connection with transactions involving federally related mortgage loans other than for services actually performed. Acceptance by MERS of such charges violates 12 U.S.C. § 2607(b), and is a violation that cannot be waived.

81. As a result of the Defendant CPH's violations of RESPA, they are liable to Plaintiffs in an amount equal to three

---

[8] Beginning in 2007 this fee was increased to $4.95; subsequently increased again in 2009 to $6.95.

times the amount of charges paid by Plaintiffs for "settlement services" pursuant to 12 USC section 2607(d)(2).

82.   In violation of RESPA, 12 U.S.C. § 2607, in connection with the mortgage loan to Plaintiffs, Defendants violated Home Ownership Equity Protection Act (HOEPA), which is codified at 15 USC section 1639 et seq., because Defendants misrepresented charges to Plaintiffs as real estate services, that in fact, were not services pertaining to real estate.

83.   As a result of the Defendants' violations of HOEPA they are liable to Plaintiffs in an amount equal to three times the amount of charges paid by Plaintiffs for "settlement services" pursuant to 12 U.S.C. § 2607(d)(2).

84.   Section 3500.6 of RESPA requires lenders to provide a special information booklet at the time of loan application. Based on information and belief, the Special information booklet was not provided to the borrowers by Defendants at the time of the loan application.

85.   As a result of the foregoing violations, Defendants are liable to Plaintiffs for actual damages, treble damages, and such other damages as the court may award, together with costs of the action and reasonable attorneys' fees.

## CLAIM IV
### FRAUDULENT OR NEGLIGENT MISREPRESENTATION
#### (Against Defendant CPH)

86.   Plaintiffs incorporate all of the preceding paragraphs of this complaint as if set forth in full here.

87.   CPH knowingly and intentionally concealed material information from Plaintiffs that was required by federal statutes and regulations to be disclosed to the Plaintiffs both before and at the time of closing.

88.   CPH also materially misrepresented and/or failed to disclose material information to the Plaintiffs with full knowledge by defendants that the affirmative representations were false, fraudulent, and misrepresented the truth at the time said representations were made and/or were omissions of material fact.

89.   The omissions of material fact and/or the material misrepresentation of material facts include but are not limited to, the following:

(a)   Concealing the failure to follow usual and customary underwriting guidelines to qualify Plaintiffs for a loan;

(b)   Misrepresenting and/or concealing the true terms of the loan;

(c)   Misrepresenting the ability to refinance the loan at a later date;

(d)   Misrepresenting and/or concealing the true amount of interest Plaintiffs would have to pay over the life of the loan;

(e)   Concealing that property values were declining and would likely continue to do so in the foreseeable future;

(f)   Concealing that Plaintiffs would likely experience mortgage payment distress and had a high likelihood of defaulting on the Note;

(g)   Concealing that there would not be sufficient equity in the Property to refinance the loan;

(h)   Concealing any risks or warnings associated with the securitization of the Plaintiffs' collateral (the Property);

(i)   Concealing that Defendants would wrongfully, improperly, and illegally report negative information as to the Plaintiffs to one of more credit reporting agencies, resulting in Plaintiffs having negative information on their credit reports and the lowering of their FICO scores such that they would not be able to qualify in the future to refinance the subject loan.

90.   Under the circumstances, the material omissions and the material misrepresentations of CPH were malicious.

91.   Plaintiffs, not being investment bankers, securities dealers, or mortgage lenders, reasonably relied upon the representations of CPH in agreeing to execute the mortgage loan documents.

92.   Had Plaintiffs known of the falsity of CPH's representations and/or known of the omissions of material facts, Plaintiffs would not have entered into the transactions which is the subject of this action.

93.   As a direct and proximate cause of CPH material omissions and material misrepresentations, Plaintiffs are entitled to rescission of the subject Note and Mortgage, and damages in such amounts as shall be proven at the time of trial.

## CLAIM V
## BREACH OF FIDUCIARY DUTY
## (Against Defendant CPH)

94.   Plaintiffs incorporate all of the preceding paragraphs of this complaint as if set forth in full here.

95.   CPH contracted to provide mortgage loan services that were to result in a loan program for Plaintiffs that was best suited to the Plaintiffs' needs given their income and expenses. Hence, CPH, and its employees and agents were, "fiduciaries" in which Plaintiffs put their trust and confidence, especially given that Plaintiffs were not and are not investment bankers,

securities dealers, mortgage lenders, mortgage brokers, or mortgage lenders.

96. CPH breached its fiduciary duties to the Plaintiffs by fraudulently inducing Plaintiffs to enter into a mortgage transaction that was; (i) contrary to the Plaintiffs' stated intentions, (ii) contrary to the Plaintiffs' interests, and (iii) contrary to the Plaintiffs' interest in the preservation of their home.

97. CPH, or entities with in the enterprise of Defendants, breached its fiduciary duties to the Plaintiffs by taking positions in the highly leveraged futures or options market that were in direct opposite of Plaintiffs' interests and the general housing market as a whole.

98. As a direct and proximate result of breaches of fiduciary duties by the Defendants and, or their predecessors, or successors in interest, Plaintiffs are entitled to rescission and damages.

99. Additionally, under the totality of the circumstances, the Defendants' actions were willful, wanton, intentional, and with the callous and reckless disregard for the interests and rights of the Plaintiffs, hence, justifying an award of actual and compensatory damages, exemplary damages, and punitive damages to deter future similar conduct of the named Defendants.

Further, and award of punitive damages will deter other persons or entities with similar inclinations.

## CLAIM VI
## UNJUST ENRICHMENT
## (Against All Defendants)

100. Plaintiffs incorporate all of the preceding paragraphs of this complaint as if set forth in full here.

101. Defendants have an implied contract and warranty with Plaintiffs to ensure that the Plaintiffs understood all fees, rates, payments and charges which would be paid to the Defendants, to obtain credit on Plaintiffs' behalf, to not charge any fees which are not related to the settlement of the loan and without full disclosure to Plaintiffs, and that the loan products together would provide a 30-year mortgage designed specifically with the Plaintiffs' known personal financial information required by the Defendants.

102. Defendants cannot, in good conscience and equity, retain the benefits from their actions of charging a higher interest rate, fees, rebates, kickbacks, profits and gains from any resale of mortgages and notes using Plaintiffs identities, credit scores, income, appraisal and reputation without consent, right, justification or excuse as part of an illegal enterprise scheme.

103. Defendants have been unjustly enriched at the expense of the Plaintiffs, and maintenance of the enrichment would be contrary to the rules and principles of equity.

104. Defendants have also been additionally enriched through the receipt of payment from third parties including, but not limited to, investors, insurers, other borrowers, the United States Department of the Treasury, United States Federal Reserve, and others.

105. Plaintiffs thus demand restitution from the Defendants and/or their predecessors or successors in interest in the form of actual damages, exemplary damages, and attorney's fees.

## CLAIM VII
## CIVIL CONSPIRACY
## (Against All Defendants)

106. Plaintiffs incorporate all of the preceding paragraphs of this complaint as if set forth in full here.

107. In connection with the application for and consummation of the mortgage loan which is the subject of this action, Defendants agreed, between and among themselves, to engage in actions and a course of conduct designed to further an illegal scheme, or accomplish a legal act by unlawful means, and, to commit one or more overt acts in furtherance of the conspiracy to defraud the Plaintiffs.

108. Defendants agreed between and among themselves to engage in the conspiracy to defraud for the common purpose of

accruing economic gains for themselves at the expense of, and detriment to, the Plaintiffs.

109. The Defendants' acts, or omissions, were committed intentionally, willfully, wantonly, and with reckless disregard to the rights and interests of the Plaintiffs.

110. Defendants' actions have resulted in fraud on the Plaintiffs and breaches of fiduciary duties such that Plaintiffs has suffered damages both monetary and physically.

111. Plaintiffs thus demand an award of actual, compensatory, and punitive damages.

## CLAIM VIII
## MISTAKE
### (Against CPH, MERS, BOA, AND BAC)

112. Plaintiffs incorporate all of the preceding paragraphs of this complaint as if set forth in full here.

113. If the above mentioned wrongful acts and/or omissions of Defendants were not fraudulent misrepresentations and/or omissions of material fact, then the underlying transaction was entered into based upon mutual mistake which entitles Plaintiffs to actual damages including all fees and costs paid to obtain the loan, together with other claims in such amounts as shall be proven at the time of trial.

## CLAIM IX
## SLANDER OF TITLE
### (Against All Defendants)

114. The allegations contained in the preceding paragraphs of this Complaint are incorporated herein by reference.

115. Upon information and belief, CPH followed its then-customary practice of originating Plaintiffs' loan and promptly offloading it to be pooled with other mortgages, securitized, and sold to investors. Therefore, CPH, its "nominee" MERS, and its successors in interest, BOA and BAC did not hold the mortgage and could not have assigned the same on or about March 25, 2010, when the Assignment of Mortgage from CPH to BAC was allegedly executed.

116. On or about April 9, 2010, defendant MERS, purportedly acting on behalf of CPH willfully, wrongfully, without justification, and without privilege caused to be recorded with the Hawaii Bureau of Conveyances, a document purporting to be an Assignment of Mortgage on the Subject Property from MERS, as nominee, to BAC.

117. Upon information and belief, as part of the securitization process, the Plaintiffs' Mortgage was long-ago transferred from CPH to a Depositor, and subsequently to a Trustee, acting on behalf of investors. At no time has any named Defendant put forth any document that shows that it represents the Trustee or the Trust. MERS assignment of mortgage was false, the non-judicial foreclosure upon which it was predicated was improper, and the resulting Quitclaim Deed is void or voidable.

All of which legal documents caused doubt to be placed on Plaintiffs' title to the Subject Property.

118. The recording of the Assignment and Quitclaim Deed directly impaired the vendibility of the property on the open market in an amount to be determined at trial.

119. The recording of the documents made it necessary for Plaintiffs to retain attorneys and bring this action to cancel the instruments, casting doubt on the Plaintiffs' title. Therefore, Plaintiffs are entitled to attorney's fees and costs incurred in cancelling the instruments. The exact amount of such damages is not known to Plaintiffs at this time, and Plaintiffs will move to amend this complaint to state such amount when the same becomes known.

120. The aforementioned Assignment of Mortgage was motivated by fraud and malice, in that Defendant MERS and/or BOA and/or BAC knew that the assignment was false, because these entities knew or should have known that MERS and/or CPH did not have an interest in the Mortgage on the Subject Property when MERS assigned the Mortgage to BAC, and nevertheless caused an officer of MERS, make the Assignment to BAC, in conscious disregard of, and in an attempt to interfere with Plaintiffs' rights. Such action, and those resulting from it, including the non-judicial foreclosure and subsequent quitclaim deed to FNMA,

warrants an award of exemplary damages in an amount to be determined at time of trial.

121. Further the Plaintiffs pray for an injunction, staying issuance and/or execution of any action to eject them from the Subject Property until such time as this claim has been resolved.

122. The real party in interest on the Lender's side may be the owner of an asset-backed security, the insurer through some claim of equitable interest, or some other person or entity. The security is a "securitized" bond deriving its value from the underlying mortgages of which the subject Mortgage is one.

## CLAIM X
### UNFAIR AND DECEPTIVE ACTS OR PRACTICES
### (Against All Defendants)

123. Plaintiffs incorporate all of the preceding paragraphs of this complaint as if set forth in full here.

124. The Plaintiffs are "consumers" as that term is defined in HRS § 480-1.

125. The Defendants' described acts and practices involved "trade or commerce" as that term is used in HRS § 480-2(a).

126. An unfair or deceptive act or practice (UDAP) in the conduct of any trade or commerce is unlawful pursuant to HRS § 480-2(a).   And certain deceptive trade practices are also unlawful pursuant to HRS §481A-3.   In connection with the

subject loan, Defendants engaged in UDAPs that violate HRS § 480-2(a) and or 481A-3, including but not limited to:

a.  Targeting financially unsophisticated and otherwise vulnerable consumers for inappropriate credit products;

b.  Failing to adequately disclose the true costs and risks of the subject loan and its/their inappropriateness for Plaintiffs;

c.  Failing to disclose that lender approved the subject loan based on financial documents required by Defendants such as Plaintiffs' tax returns and pay stubs without regard to Plaintiffs ability to sustain the loan with any reasonable means test;

d.  Falsely representing and/or failing to fully and completely disclose the amounts Plaintiffs were required to pay;

e.  Making a defective mortgage loan or loans that resulted in little net economic benefit to Plaintiffs with the primary objective of generating fees;

f.  Attempting to deprive Plaintiffs of time in a fictitious modification process until the statute of limitations passed beyond a time for their

legal right for rescission and/or cancel the subject loan.

127. The conduct caused Plaintiffs to suffer injury to their property, including without limitation wrongfully induced payment of money.

128. Defendant BAC's acts of attempting to foreclose without the requisite legal title to the Subject Mortgage, while falsely stating that it had such title, constitutes a "false, deceptive or misleading representation or means" in connection with the collection of a debt, in violation of the Federal Fair Debt Collection Procedures Act, 15 U.S.C. Sec. 1692e.

129. Defendants' described acts and practices offend established public policy and/or were immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers, and were therefore unfair in violation of HRS § 480-2(a).

130. Defendants' described acts and practices involved material representations, omissions or practices that were likely to mislead consumers acting reasonably under the circumstances, and were therefore deceptive in violation of HRS §§ 480-2(a), 481A-3 and/or 454M.

131. Pursuant to HRS § 480-12, a contract or agreement in violation of HRS Chapter 480 is void and is not enforceable at law or in equity.

132. Pursuant to HRS § 480-13(b)(1), a consumer who is injured by a UDAP is entitled, for each UDAP, to be awarded a sum not less than $1,000 or threefold any damages he or she sustained, whichever sum is the greater, and reasonable attorney's fees together with the costs of suit.

133. As a result of the wrongful acts and/or omissions of Defendants, Plaintiffs are entitled to various remedies including, but not limited to, rescission, consideration, reimbursement, equitable recoupment, indemnification, damages (statutory, actual and treble damages), attorneys' fees and costs, and injunctive relief.

## CLAIM XI
### NEGLIGENT AND/OR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
#### (Against Defendants CH1 and BAC)

134. Plaintiffs incorporate all of the preceding paragraphs of this complaint as if set forth in full here.

135. Defendant CHL negligently and/or intentionally inflicted severe mental and emotional distress upon Plaintiffs by misleading them, providing a loan product they were not properly qualified for, in causing them to lose their savings.

136. Defendant BAC negligently and/or intentionally inflicted severe mental and emotional distress upon Plaintiffs by giving them false hope they would qualify for a refinance and/or loan modification, and/or that they would be given loan assistance on reasonable terms that would allow Plaintiffs the

right to keep their home, and whereby Plaintiffs have been unable to sleep, eat, or carry on normal marital relations due to the stress caused by Defendants. Plaintiffs' children have experienced anxiety related to the potential loss of their family home.

137. The wrongful acts and/or omissions of Defendants and/or their predecessors or successors in interest were a substantial factor and/or proximate cause of Plaintiffs suffering injuries and damages in such amounts as shall be proven at the time of trial.

138. As a result of the wrongful acts and/or omissions of Defendants, Plaintiffs are entitled to various remedies including, but not limited to, rescission, reimbursement, equitable recoupment, indemnification, damages (statutory, actual, punitive and/or treble damages), attorneys' fees and costs, and injunctive relief.

## CLAIM XII
## VIOLATION OF HAWAII REVISED STATUTES CHAPTER 667
### (Against Defendant BAC)

139. Plaintiffs incorporate all of the preceding paragraphs of this complaint as if set forth in full here.

140. Hawaii Revised Statutes Chapter 667, and more specifically section 667-5 et seq. provides, in part, that when any mortgagee or its successor in interest intends to foreclose under power of sale, they shall be represented by an attorney

who is licensed to practice law in the state who is physically located in the state, who shall give notice of the intent to foreclose by publication of notice once in each of three successive weeks, the last to be not less than 14 days before the date of sale, in a newspaper having a general circulation in the county in which the mortgaged property lies, and to post said notice on the premises not less than 21 days before the date of sale; and to record an affidavit of sale by the person conducting the foreclosure, showing compliance with the requirements of the power of sale and the statute.

141. Based on information and belief, the notice of intent to foreclose was not provided to the Plaintiffs pursuant to HRS 667-5. The Affidavit of Non-Judicial Foreclosure purports to attach said Notice of Intent to Foreclose as Exhibit B, but it is not attached. Further, the Return of Posting purports again to attach the Notice of Intent, but it is again not attached. *Exhibit 3.*

142. Thus, the foreclosure under power of sale is invalid and Plaintiffs are entitled to one or more of the following remedies: return of the property, actual damages in an amount to be determined at trial, and attorney's fees and costs.

**CLAIM XIII**
**VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT**
**(Against Defendant BAC)**

143. Plaintiffs incorporate all of the preceding paragraphs of this complaint as if set forth in full here.

144. The Fair Debt Collections Practices Act (FDCPA), 15 U.S.C. §§ 1692-1692p as amended by Pub. L. 109-351, Sections 801-02, 120 Stat. 1966 (2006), Section 809 requires among other things, that within five days after the initial communication with the consumer in connection with the collection of any debt, the debt collector shall send the consumer written notice containing the amount of the debt, the name of the creditor, and that the consumer may dispute the debt within 30 days, and if the consumer notifies the debt collector that the debt or any portion thereof is disputed, it shall cease collection of the debt until it verifies the debt or the name and address of the original creditor and this is mailed to the consumer.

145. Based on understanding and belief, Defendant BAC failed to give Plaintiffs the required notice and opportunity to contest the debt and request verification of the same. BAC's failure to give the required notice invalidates the foreclosure conducted with regard to the subject property.

146. Defendant BAC's acts of pursuing a foreclosure action without the requisite legal title, while falsely stating that it had such title, further constitutes a "false, deceptive or misleading representation or means" in connection with the

collection of a debt, in violation of the Federal Fair Debt Collection Procedures Act, 15 U.S.C. Sec. 1692e.

147. Pursuant to section 813, Defendants and/or their predecessors in interest are liable to Plaintiffs in amount equal to the sum of actual damages and such additional damages as the court may allow, and the costs of action together with reasonable attorney's fees.

## CLAIM XIV
## INTENTIONAL OR NEGLIGENT FAILURE TO WARN OF DEFECTIVE PRODUCT
## (Against Defendant CPH)

148. Plaintiffs incorporate all of the preceding paragraphs of this complaint as if set forth in full here.

149. Defendant CPH or its successors in interest intentionally or negligently failed to warn Plaintiffs of the risks associated with its loan products, which at all times relevant herein were known to be defective and/or high-risk products. Defendant CPH and/or its agent(s) failed to provide the Plaintiffs with information that the loan being issued was too large given the Plaintiffs' ability to repay and that it had characteristics that increased the likelihood of default.

150. The loan that the Plaintiffs were enticed into purchasing was a defective product, exposing the Plaintiffs, and others similarly situated, to a high risk of financial damage, including bankruptcy and the loss of their home.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for a Judgment against Defendants, as follows:

1.   For a judgment in favor of the Plaintiffs.

2.   For a judgment awarding statutory damages in such amounts as shall be shown at the time of trial.

3.   For a judgment awarding actual damages in such amounts as shall be proven at the time of trial.

4.   For a judgment awarding treble damages.

5.   For a judgment awarding punitive damages in such amounts as shall be proven at the time of trial.

6.   For a Temporary Restraining Order or Order for Injunctive Relief.

7.   For a judgment of rescission, recoupment, reimbursement and/or indemnification in such amounts as shall be proven at the time of trial.

8.   For such other and further relief as the Court deems just and equitable in the premises.

/ / /

/ / /

/ / /